[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Case No. 1:25-cr-370 (CRC)** |
| | ) | |
| **ZUBAYAR AL BAKOUSH** | ) | **Partially Under Seal** |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**MR. AL BAKOUSH'S MOTION FOR**
**DISCLOSURE OF GRAND JURY MATERIALS**

(U) The defense review of discovery has identified several material inconsistencies between the pleadings and the evidence, as well as in official communications. These contradictions raise a significant risk that irregularities in the grand jury process may have influenced the grand jury to return the indictment. Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), Mr. Zubayar Al-Bakoush respectfully requests that this Honorable Court direct the government to disclose the transcripts and audio recordings of all proceedings before the grand jury in this case, at the very least for *in camera* review by the Court. Although proceedings before the grand jury are typically entitled to a presumption of regularity, the abundant irregularities present in the evidence when read alongside the indictment and procedural history in this case overcome that presumption and warrant disclosure of the grand jury record.

[redacted]

[redacted]

## BACKGROUND

(U) On September 11, 2012, the United States Special Mission and a CIA Annex in Benghazi, Libya was attacked. These U.S. outposts had been protected by a combination of U.S. personnel and local militia. *See Report: Accountability Review Board for Benghazi*, UNITED STATES DEP'T. OF STATE at 19 (December 19, 2012).[1] Tragically, four Americans lost their lives, including an American ambassador, a foreign service officer, and two retired Navy SEALs. Nearly three years later, on August 10, 2015, the U.S. government charged Zubayar Al-Bakoush by criminal complaint. The government's factual allegations in the 2015 affidavit for criminal complaint were that Mr. Al-Bakoush was armed and on the grounds of the U.S. Mission compound and that he was "inspecting vehicles near Villa B and walking by the Office." ECF No. 1-1 at 11.

(U) In 2020, Mr. Al-Bakoush was effectively arrested by the FBI who then spent one year conducting four interviews of Mr. Al-Bakoush while he was in custody in Libya. Mr. Al-Bakoush willingly spoke to the FBI, acknowledged his presence at the U.S. Mission, and explained that he was part of a preventative security force. Although FBI policy at the time generally required audio recording of subject interviews, no such recordings were made of Mr. Al-Bakoush's interviews and we are left only with the FBI's characterizations of what Mr. Al-Bakoush said through an Arabic translator.

(U) These interviews were loaded with exculpatory information, including information that could be corroborated through individuals Mr. Al-Bakoush mentioned. In the December 12, 2020 interview, the FBI reported the following from the interview:

[1] (U) https://2009-2017.state.gov/documents/organization/202446.pdf



[redacted]

[redacted]

[redacted]

USAO-092682-83.[2]

(U) Mr. Al-Bakoush had two follow on interviews on December 13, 2020 and December 15, 2020 in which he, among other things, describe[redacted]. *See* USAO-092688-98.

(U) After these interviews, on March 24, 2021, the FBI met with a [redacted] who reported, among other things, that [redacted] and tha[redacted]

[2] (U) Citations are to the bates numbers provided by the government with the discovery. The full reports are available for the Court's review should it wish to see them.



[redacted]

[redacted]

[redacted]

USAO-211190-91.

(U) Following this interview, on April 3, 2021, the FBI went back to Mr. Al-Bakoush for a final interview. The FBI reported that:

[redacted]

USAO-092674.

...

[redacted]

USAO-092674.

...



[redacted]

[redacted]

[redacted]

USAO-092675.

...

[redacted]

*Id.*

...

[redacted]

USAO-092676.

...

[redacted]

USAO-092678.

...

[redacted]

*Id.*



[redacted]

[redacted]

...

[redacted]

USAO-092679.

(U) After this interview, in 2021, Mr. Al-Bakoush was released. He returned to Tripoli where he lived with his wife and children. The discovery is devoid of any investigative steps to corroborate or rebut the information Mr. Al-Bakoush provided including his reported alibis or confidants from that evening, or any follow on interviews of fellow members of the security committee.

(U) Roughly five years later, ten years after the filing of the criminal complaint, and nearly fourteen years after Mr. Al-Bakoush's alleged crimes, the government indicted Mr. Al-Bakoush. In the indictment, the government asserted the same allegation that Mr. Al-Bakoush was present at the U.S. Mission and additionally claimed that Mr. Al-Bakoush "conducted surveillance" and "attempted to gain entry to vehicles belonging to Mission staff." *Indictment*, ECF No. 6 at 6-7. Also for the first time, the government asserted that Mr. Al-Bakoush was a member of Ansar Al-Sharia. The affidavit for the criminal complaint made no such claim. *See* ECF Nos. 1-1, 6. There is no allegation, in any document, that Mr. Al-Bakoush was present at the attack on the CIA annex, and there is no material that



[redacted]

[redacted]

supports the notion that Mr. Al-Bakoush was present at the mission longer than 4-5 minutes during the course of a 7.5-hour attack.[3]

(U) In early 2026, shortly before the President's State of the Union Address (in which Mr. Al-Bakoush was mentioned) the U.S. government [redacted] and brought him to trial on charges that carry the possibility of death. In announcing Mr. Al-Bakoush's arrest, then-Attorney General Pam Bondi suggested that he was on the run and attempting to hide. *See* DOJ Press Conference, Associated Press (Feb. 6, 2026) ("If you commit a crime against the American people anywhere in this world, President Trump's Justice Department will find you. It might not happen overnight, but it will happen. You can run, but you cannot hide.").[4]

(U) The Justice Department knows that insinuation was false, as it is well aware that Mr. Al-Bakoush had willingly spoke with the FBI in 2020 and 2021, that he had been in the control of the FBI – and interviewed—during the prior Trump administration, and that he had been living openly under his name with his family in government housing in Tripoli for over a decade. That is not a man on the run; that is a man doing what he could to cooperate with the FBI, having nothing to hide, knowing that he is innocent.

(U) Following Mr. Al-Bakoush's transfer to the United States, the defense began receiving discovery that has only continued to reveal more inconsistencies. The video in

[3] (U) The affidavit first places Mr. Al-Bakoush at the Mission compound at 10:01 p.m., Compl. Aff. ¶ 23(e), and last places him at the Mission compound at approximately 10:05 p.m. *Id.* ¶ 23(g). The Mission's surveillance video has Mr. Al-Bakoush first appearing at 22:01 and then departing the Mission at 22:06—a five-minute time span.

[4] (U) https://youtu.be/qKQG3Opr8PI at 2:18



[redacted]

which Mr. Al-Bakoush is seen on the U.S. Mission compound purportedly attempting to "gain entry" (*Indictment*, ECF No. 6 at 7) into vehicles shows Mr. Al-Bakoush arriving near, but not apparently with others, not gesturing or talking to anyone, and fleetingly pulling on the door handles of two vehicles that *had the doors on the other side wide open.* This video is attached as Defense Exhibit 1 under seal pursuant to a protective order. Screenshot stills are below.

[redacted]

*Mr. Al-Bakoush walks past the open car doors and over to the other side of the vehicles.*

(U) The obvious insinuation that the government sought to make, that Mr. Al-Bakoush was attempting to break into cars, is contradicted by the video evidence. This video – all two minutes and six seconds of it, spanning a 5-minute period – comprises the sum total of Mr. Al-Bakoush's alleged conduct related to the events at the U.S. Mission.

(U) This car break-in claim is not the only contradiction between the government's indictment and the evidence. The new accusation in the 2025 indictment that states that Mr. Al-Bakoush was a member of Ansar Al-Sharia, an extremist group with ideological links to Al Qaeda, is significantly undermined by the government's own cooperating witnesses in [redacted] the jury trials in 2017 and 2019. In all these contexts, cooperators identified Mr. Al-Bakoush as being a member of Tariq bin Zaid, and not Ansar Al-Sharia.[5]

---

[5] (U) These cooperators identified other individuals as being members of Ansar Al-Sharia.

(U) Prior to any trials, [redacted] in March 2015, the person called Bilal Al-Ubydi [redacted]:

[redacted]

USAO-077175.

(U) [redacted] around that same time, FBI agents showed [redacted]. In none of them does [redacted]. We have no record of what [redacted], despite ordinary FBI practice being to file any materials shown to a witness as an attachment to the interview report. But the absence of any mention of Mr. Al-Bakoush means either Mr. Al-Bakoush could not be identified [redacted].

(U) During trial, the person testifying as Bilal Al-Ubydi stated that Mr. Al-Bakoush was a member of Tariq Bin Ziad, and that when he saw Mr. Al-Bakoush with Mr. Khatallah, it was at the beginning of the revolution against Muammar Gaddafi in a different city:

BY MS. HIMELSTEIN:
Q How long have you known Zubayr Bakoush?
A From the time of the revolution.
Q And do you know what group Zubayr Bakoush is in?
A Yes.
Q And what group is that?
A He is the commander of the brigade Tariq Bin Ziad.

...

[redacted]

BY MS. HIMELSTEIN:
Q Have you ever seen Zubayr Bakoush with Abu Khatallah?
A Yes.
Q Where did you see Zubayr Bakoush with Abu Khatallah?
A At the beginning of the revolution in the City of Ajdabiya. I mean, during the war, that is.
Q And is Ajdabiya a place where the fighting occurred during the revolution?
A Yes.
It's about 170 kilometers from Benghazi but before Brega.
Q And you just said that you saw Zubayr Bakoush with Abu Khatallah?
A Yes.
Q And what did you see them doing during the revolution when you saw them together?
A It was during the war.

*United States v. Khatallah*, No. 1:14-cr-00141, Trial Tr. at 2441-43 (D.D.C. Oct. 17, 2017).

Q. Let me ask if you recognize the individual who is Government's Exhibit No. 100-8?
A. Yes.
Q. And who is that?
A. Zubayr Al-Bakoush.
Q. And how did you know Zubayr Bakoush?
A. I came to know him during the revolution.
Q. And when did you first meet him?
A. In Brega, approximately the early days of the revolution.
Q. And did you fight alongside him in the revolution?
A. Yes.
Q. And what was your relationship like with Zubayr Al-Bakoush?
A. By virtue of my position. He was the commander of a brigade, and I was the head of managing a group or unit.
Q. And what brigade was he a commander of?
A. He was the commander of Tariq Bin Ziyad Brigade.
Q. And, again, is that a senior position within the brigade?
A. Yes.

*United States v. Al-Imam*, No. 1:17-cr-00213, Trial Tr. at 883 (D.D.C. May 13, 2019).

Q. And who is that?
A. Zubayr Al-Bakoush. He is the commander of Tariq bin Ziyad brigade.



[redacted]

[redacted]

*United States v. Al-Imam*, No. 1:17-cr-00213, Trial Tr. at 981 (D.D.C. May 13, 2019).

(U) The person testifying as Ali Majrisi equivocated on Mr. Al-Bakoush being a member of Ansar Al-Sharia. He stated:

> Q. Do you recall testifying at a prior proceeding that Zubayr Al-Bakoush was in that brigade?
> A. Tariq Bin Ziyad? I can't remember. It's long time ago, but no. I think in Libya Hurra, that's where I saw him.
> Q. Let me ask you a different question.
> In your experience, the people you knew during the revolution, did they always stay in one brigade, or did they sometimes switch between other brigades?
> A. They switched.
> Q. In your experience with Mr. Bakoush, was he always in the same brigade or --
> A. No. No, he switch a lot.

*United States v. Al-Imam*, No. 1:17-cr- 00213, Trial Tr. at 2057 (D.D.C. May 21, 2019).

> Q. This is Zubayr Al-Bakoush, right?
> A. Yes, sir.
> Q. You know him very well, right?
> A. I know him very well, yes.
> Q. You've known him since your teenage years?
> A. Yes.
> Q. And you were in Boy Scouts with him?
> A. Yes.
> Q. You spoke on the phone many times with him?
> A. Yes.
> Q. You've traveled to visit him at his place of work?
> A. I travel what?
> Q. You've visited him at his place of work?
> A. His work, yes.
> Q. And he belongs to Ansar Al-Sharia, right?

> A. He change all the time. He belonged to everybody.
> Q. He was in lots of different brigades?
> A. Yes.

*United States v. Al-Imam*, No. 1:17-cr- 00213, Trial Tr. at 2150-51 (D.D.C. May 21, 2019).



[redacted]

[redacted]

(U) Even following these trials, the [redacted] does not identify Mr. Al-Bakoush as being a part of Ansar Al-Sharia or having any part in planning an attack on the U.S. Special Mission. *See supra* USAO-211189-92.

(U) Thus, prior to seeking an indictment against Mr. Al-Bakoush, the government had this prior testimony in two trials. It also had scores of interviews with witnesses prior to those two trials, and interviews with a witness in 2021.[6] The FBI had multiple interviews with Mr. Al-Bakoush in 2020 and 2021 while he was in effective FBI custody. None of this information substantiates a claim that Mr. Al-Bakoush was a part of Ansar Al-Sharia, that he was attempting to break into any cars, or that he was anything more than merely present for five minutes of a 7.5-hour attack on the U.S. Mission.

(U) Additionally, inconsistencies are present in the government's 302 reports from the interviews of Mr. Al-Bakoush in 2020 and 2021. For example, one of the 302 reports describes [redacted]:

[6] (U) On information and belief, the FBI has interviewed numerous extremists captured in and around Benghazi by forces associated with Khalifa Haftar. These interviews would have undoubtedly included questions about the identities of individuals, like Mr. Al-Bakoush, who appeared in surveillance footage during the breach of the U.S. Special Mission. Every example of a suspected member of Ansar Al Sharia or associated extremist group who told the FBI he did not recognize Mr. Al-Bakoush's image or associated Mr. Al-Bakoush's image with another group is discoverable under *Brady v. Maryland* and its progeny, and the defense is separately seeking its production.



[redacted]

[redacted]

[redacted]
USAO-092685.

(U) But neither the claim about the timing nor the one about the vehicles is supported by the video evidence. The government's own evidence and its pleadings places Mr. Al-Bakoush on the compound for five minutes, not 25 minutes. And again, it defies logic to describe Mr. Al-Bakoush's fleeting act of pulling on a door handle of a car with the other door wide open as an attempted break-in.

[redacted]

[redacted]

[redacted]

[redacted]



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(U) The government also made reference to [redacted] related to his indictment.

[redacted]

(U) The defense is unaware of any [redacted] during this timeframe. If such evidence was presented to the grand jury, Mr. Al-Bakoush needs this evidence. If it was not, it represents another inconsistency in the government's representations about the evidence in this case.

---

[redacted]



[redacted]

[redacted]

(U) Finally, in its filing requesting a protective order, the government disputes the notion that Mr. Al-Bakoush's custody in Libya "from November 2020 to December 2021 was equivalent to an arrest by the FBI." ECF No. 49, n. 2.[8]

[redacted]

---

[8] (U) The government makes this pronouncement in a footnote, but then does not actually meaningfully challenge Mr. Al-Bakoush's assertion on this point. *See* ECF No. 49.



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

ARGUMENT

(U) Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), a court may order the disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). That rule strikes a balance between two competing principles of criminal law. The first is that courts have the authority to "dismiss an indictment because of misconduct before the grand jury." *United States v. Williams*, 504 U.S. 36, 46 (1992) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). That authority would be meaningless if defendants were unable to access grand jury materials and inform the court about potential misconduct. At the same time, "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983) (citations omitted). For that reason,



[redacted]

[redacted]

courts must exercise caution when determining whether to order the disclosure of grand jury materials.

(U) After balancing the relevant interests, courts may order disclosure under Rule 6(e)(3)(E)(ii) when defendants "establish[] that particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment." *United States v. Loc Tien Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004) (citing *United States v. Abcasis*, 785 F. Supp. 1113, 1119 (E.D.N.Y. 1992)) (internal quotation marks omitted). That standard prevents "fishing expedition[s] to search for grand jury wrongdoing and abuse when there are no grounds to believe that any wrongdoing or abuse has occurred." *Id.* But it also recognizes a consensus among district courts that disclosure is appropriate when a defendant demonstrates a "particularized need" for grand jury materials. *United States v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007) (citing cases).

(U) In *Naegele*, this Court permitted disclosure of the grand jury record because the government had misled the grand jury about the existence of a part of a document on which multiple counts of the indictment returned by the grand jury were based. *Naegele*, 474 F.Supp.2d at 11. A complete form of this document was never, in fact, presented to the grand jury.

(U) Recently, in *United States v. Comey*, 809 F. Supp. 3d 396, 412 (E.D. Va. 2025) the district court held that "the procedural and substantive irregularities that occurred before the grand jury, and the manner in which evidence presented to the grand jury was collected and used, may rise to the level of government misconduct resulting in prejudice to [the defendant]." Specifically, in ordering disclosure of grand jury materials to the defense,



[redacted]

[redacted]

the court found that "the government's actions ...–whether purposeful, reckless, or negligent–raise genuine issues of misconduct, are inextricably linked to the government's grand jury presentation, and deserve to be fully explored by the defense." *Id.* It explained that "the record points to a disturbing pattern of profound investigative missteps, missteps that led an FBI agent and a prosecutor to potentially undermine the integrity of the grand jury proceeding." *Id.*

(U) Mr. Al-Bakoush, who had been well-known to the FBI and under criminal charges for years, who was arrested at one point and let go, was indicted under a time of intense political pressure related to the Jeffrey Epstein files when such a distraction would have been welcomed, and perhaps even sought. However, when this indictment is viewed alongside the actual evidence and the procedural history, it reveals "a disturbing pattern of profound investigative missteps, missteps that led an FBI agent and a prosecutor to potentially undermine the integrity of the grand jury proceeding," *id,* and provides "particularized and factually based grounds" that warrant disclosure of grand jury materials. *Naegele*, 474 F.Supp.2d at 11.

(U) The government, in the indictment, tries to cast Mr. Al-Bakoush's benign actions—simply trying the door handles on an unlocked car—as something nefarious—breaking into locked cars—when the objective evidence does not support such an inference. *See* Def.'s Ex. 1. This gives rise to the question of whether the video was "summarized" by a government agent to the grand jury, or whether it was actually played for the grand jurors. That the indictment has language that does not track indisputable evidence on a video, creates "grave doubt that [the grand jury's] decision was free from [improper] influence," *Bank of Nova Scotia*, 487 U.S. at 256.



[redacted]

[redacted]

(U) Similarly, the inconsistencies in FBI 302 reports of Mr. Al-Bakoush's interviews [redacted]

(U) Similarly, in its filing requesting a protective order, the government stated it disputes that Mr. Al-Bakoush's arrest was equivalent to the arrest by the FBI, [redacted]

(U) The reference to [redacted]

[9] (U) These facts are critical for the Court's speedy trial and due process analysis. However, as discussed in Mr. Al-Bakoush's response in opposition to the government's motion for a protective order, a decision on this is premature.



[redacted]

[redacted]

(U) This raises a question of whether and how the agent(s) characterized the evidence against Mr. Al-Bakoush, including information about his interview to the grand jury and again provides "grave doubt that its decision was free from [improper] influence." *Id*. Taken in total, these facts present a situation similar to *Naegele* in which the grand jury was left with an incomplete or incorrect understanding about the existence/nature of the evidence. *Naegele*, 474 F.Supp.2d at 11.

(U) The new allegation in the 2025 indictment that Mr. Al-Bakoush was a member of Ansar Al-Sharia in the face of a 2015 criminal complaint that makes no such claim is particularly problematic for the government and warrants disclosure of grand jury materials. This allegation is undermined by the sworn testimony of two government witnesses in not one trial, but two – both occurring prior to the government's presentation to the grand jury. The defendants in those trials also sat for lengthy custodial interviews and never implicated Mr. Al-Bakoush as being a member of Ansar Al-Sharia, and no other witnesses in any other interviews provided to date have made such a claim.[10] This complete void in the evidence presents yet another particularized and factually-based ground that supports a proposition that irregularities occurred in the grand jury process.

(U) Finally, the then-Attorney General's complete disregard for the facts during her press conference announcing Mr. Al-Bakoush's arrest—insinuating that he was running and hiding when the Justice Department knew that to be entirely false—displays a pattern

[10] (U) [redacted] "Al Majrisi" [redacted], but he walks back that claim during his 2019 testimony, and notably [redacted] is prior to the filing of the criminal complaint, which makes no such assertion, thus inferring that the government gave it little weight.



[redacted]

[redacted]

of deception at the highest levels and supports a finding that "inherently suspect procedures were used before the grand jury." *Nguyen*, 314 F. Supp. at 616.

(U) Each of these grounds independently warrants the disclosure of grand jury materials under Rule 6(e)(3)(E)(ii) to allow the defense to show that irregularities warrant dismissal of the indictment, or at the very least, the Court's *ex parte in camera* review of the material. The current record viewed alongside the evidence produced to date and procedural history reveals inconsistencies between the presentation of the case to the grand jury and the government's evidence.



[redacted]

[redacted]

## CONCLUSION

(U) For all of these reasons, the Court should permit the defense to inspect the transcript of all testimony before the grand jury as well as any audio recording and transcript of all colloquies between counsel and the grand jury in this case pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), or at the very least, the Court should review this material *in camera* and compared to the video and other evidence in the case.

Respectfully submitted,
ZUBAYAR AL-BAKOUSH
*By Counsel*

*/s/ Jessica Carmichael*
Jessica Carmichael, DC Bar 998952
Zachary Deubler, DC Bar 1615063
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st Fl
Alexandria, Virginia 22314
703.684.7908 / Fax 649.6360
jessica@carmichaellegal.com
zach@carmichaellegal.com

*/s/ Kyle R. Boynton*
Kyle R. Boynton, VA Bar 92123
K.R. BOYNTON, PLLC
108 N. Alfred Street, 1st Fl
Alexandria, Virginia 22314
571.274.6199
kyle@boynton.law

/s/ *Stephen Ross Johnson*
STEPHEN ROSS JOHNSON (D.D.C.Bar TN0033)
RITCHIE, JOHNSON & STOVALL, P.C
606 W. Main Street, Ste 300
Knoxville, TN 37902
(865) 637-0661
johnson@rjs.law

*Attorneys for Zubayar Al-Bakoush*



[redacted]

[redacted]

## CERTIFICATE OF SERVICE

The aforementioned pleading was provided to the Court Information Security Officer on August 21, 2026, who will in turn provided copies to both counsel for the government and the Court. Undersigned counsel has filed public and under seal versions with the Court via CM/ECF.

*/s/ Jessica Carmichael*
Jessica Carmichael



[redacted]